**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| | : | |
| PATRICIA DANIELS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 3:12-cv-0093 (VAB) |
| | : | |
| STATE OF CONNECTICUT, | : | |
| DEPARTMENT OF CORRECTION, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**RULING AND ORDER**

Plaintiff, Patricia Daniels, has brought this action against Defendant, the State of

Connecticut, Department of Correction ("DOC"), her employer, and alleges that it discriminated

against her because she is an African-American woman and retaliated against her for opposing

this mistreatment.  DOC now moves for summary judgment (Doc. No. 70).  For the reasons that

follow, the motion is GRANTED.

I.     **Background**

The following account draws from the largely undisputed facts, with all contested points

resolved in Plaintiff's favor.  Daniels has served as a corrections officer at the Bridgeport

Correctional Center ("BCC") in Bridgeport, Connecticut, since 1998.  Corrections officers are

the lowest-ranking officers at BCC.  They are supervised by lieutenants, captains, deputy

wardens, and the warden.

At some point during her time at BCC, Daniels became a union steward.  Union stewards

are responsible for ensuring that BCC officers perform their duties consistent with internal rules

and regulations.  Daniels's work as a union steward required her to monitor the conduct of her superiors and, when necessary, to challenge their actions through grievance proceedings brought on behalf of other BCC employees.  *See* Doc. No. 78-39, at 23, 43.

Daniels's employment record between the years 1998 and 2010 reflects little controversy.  At BCC, corrections officers are evaluated each year by their supervising lieutenants and ranked on a five-point scale as Excellent, Fully Successful, Satisfactory, Needs Improvement, or Unsatisfactory.  *See* Doc. No. 70-2, at ¶ 58.  After receiving "Satisfactory" marks in her first few years at BCC, Daniels scored "Fully Successful" from the 2004-05 to 2006-07 periods.  From 2007-08 through 2009-10, Daniels was rated "Excellent."[1]

The present controversy began to develop in early 2011, a time that roughly correlates with several personnel changes at BCC.  First, in early 2010, Daniels came under the direct supervision of Lieutenant Timothy Cox.  Second, in May of 2011, Kenneth Butricks transferred to BCC to serve as deputy warden.  Finally, in that same month, Timothy Farrell replaced Walter Ford as warden.  *See id.* at ¶¶ 11, 12.  With the exception of one incident involving Warden Ford, the conduct Daniels challenges occurred under the supervision of Cox, Butricks, and Farrell.

A.     2010-11[2]

The first incident that Daniels identifies occurred in January of 2011, before Farrell replaced Ford as Warden.  Daniels submitted a complaint to Warden Ford, in which she alleged that her superiors were creating a hostile work environment and impermissibly practicing "disparate treatment."[3]  Doc. No. 78-17, at 6.  About a month after complaining to Warden Ford,

---

[1] Daniels was initially ranked "Fully Successful" in 2007-08 and 2009-10.  A superior, Captain Bederman, later changed each ranking to "Excellent."  *Id.* at ¶ 59 n.1.

[2] At BCC, annual performance evaluations occur in early September.  Daniels's 2010-11 evaluation period, then, ran from September 2010 until September 2011.  This section describes the events that occurred during Daniels's 2010-11 evaluation period.

[3] The gravamen of the charge was that certain supervisors were failing to support her efforts to write disciplinary reports and sometimes criticized her reports to other staff members.  It is not clear whether Daniels asserted that they

Daniels experienced two incidents that heightened her concern.  First, in early February, a lieutenant named Carl Lovisolo began to "closely monitor[]" her entries in a log book in which officers signed out for breaks and lunch.  *Id.*  On one occasion, Lovisolo asked Daniels to write an incident report explaining why she had taken an unduly long break, but did not question a male employee, Officer Torres, who allegedly had gone off-duty for longer periods of time.  *Id.* at 6.  Second, on February 13, Daniels was assigned to lunch duty when another corrections officer, Jackie Brown, allegedly breached protocol by leaving BCC to get pizza for the lieutenants.  Brown was not disciplined, even though other officers had been suspended for like conduct.[4]  *Id.* at 8.

On February 14, Daniels met with Warden Ford to discuss her January complaint and the February events.  She told him that she had drafted a report describing instances of discrimination at BCC and had forwarded it to, among other entities, the DOC's Affirmative Action Unit, the DOC Commissioner, and the Governor's Office.  Doc. No. 70-2, at ¶ 70.  Ford asked whether Daniels was willing to discuss matters with Lovisolo instead of filing formal complaints.  Daniels refused.  *Id.* at ¶ 72.  The conversation deteriorated, and Ford allegedly threw Daniels out of his office with the admonition to "mind [her] own business."  Doc. No. 70-6, at 77.  He further warned her that she "would never be promoted" because she "talk[ed] too much."  *Id.* at 76.

At roll call the next day, Ford alluded to this incident.  He reminded staff members that officers were not permitted to leave BCC grounds during their shifts but expressed frustration that officers were complaining about their supervisors; Ford said, "If you want[] to be in charge,

---

did so because she was African-American, because she was a woman, or both, but DOC does not dispute that the complaint concerned accusations of unlawful discrimination.  Doc. No. 70-1, at 22.
[4] Jackie Brown is, like Daniels, an African-American woman.  Some of the officers who had previously been suspended for leaving the prison grounds were men.  Doc. No. 78-17, at 8.

open your own business."  Doc. No. 78-19, at 1.  Eight days later, on February 22, some BCC staff members posted messages on Facebook apparently referring to the incident at roll call and the complaint about Brown.  Neither Ford in his roll-call address nor the staff members in their Facebook messages mentioned Daniels by name.

Between February and September of 2011, Daniels continued to file complaints about her supervisors in her capacity as union steward.  Some concerned allegations of unlawful discrimination—in May, for instance, Daniels filed a complaint with the DOC's Affirmative Action Unit charging that Lovisolo was unduly scrutinizing her log entries because of her gender.  Doc. No. 70-31, at 2-3.  Many grievances did not touch upon discrimination at all.  For example, Daniels filed an internal complaint on August 18 because a supervisor had been permitted to leave the prison in violation of regulations.  Doc. No. 78-33, at 1.  Between August 25 and September 9, Daniels filed three grievances concerning the allocation of overtime.  Doc. No. 70-22, at 12.  She also wrote a number of incident reports accusing Lieutenant Cox of such conduct as "not doing his job, failing to report incidents, [and] not removing contraband from inmates."  Doc. No. 78-39, at 37.  Daniels filed so many grievances[5] that, for a time, Warden Farrell and other BCC representatives were defending before the Office of Labor Relations between one and three times weekly.  In Farrell's opinion, Daniels's penchant for filing grievances instead of resolving disputes informally suggested that she lacked "conflict resolution or communications skills."  Doc. No. 70-10, at 27.  Farrell stated in his deposition that the grievance affords dissatisfied employees "an unofficial tool of harassment."  *Id.*

During this time period, Daniels's supervisors also found fault with other aspects of her conduct.  According to Lieutenant Cox, Daniels often followed orders only reluctantly and would sometimes "huff and sigh[]" when given directions.  Doc. No. 70-9, at 26.  Daniels

---

[5] By Daniels's count, she filed more than twenty-seven between 2011 and 2013.

indicates that for these reasons, her relationship with Warden Farrell was "poor."  Doc. No. 70-7, at 239.

On September 13, 2011, Lieutenant Cox signed Daniels's 2010-11 performance evaluation.  He rated her "Fully Successful," one step below the "Excellent" rating Daniels had achieved in her 2007-08, 2008-09, and 2009-10 evaluations.  Daniels's overall evaluation comprised eight subcategories.  She scored her lowest rating—"Satisfactory"—in the "Cooperation Interpersonal Skills" category, which concerned her ability to "work[] well with others" and "deal[] effectively with conflict."  Doc. No. 70-19, at 2.  Daniels testified that she asked Cox to explain the basis for his rating, but he declined.  Doc. No. 78-39, at 42.

**B.      2011-12 and 2012-13**

Daniels continued to register complaints after receiving her 2010-11 performance evaluation.  In October 2011, she filed an affirmative action complaint alleging that Cox had rated her "Fully Successful" instead of "Excellent" because of her race and gender.  Doc. No. 70-19, at 6.  She contacted the Affirmative Action Unit by letter in November to criticize its handling of her previous complaints.  Doc. No. 70-32, at 2.  And, in October, she served as a witness in another employee's affirmative action complaint against Cox, telling an investigator that Cox "ha[d] had plenty of incidents with women of color."[6]  Daniels argues that because of such complaints, and because of her race and gender, her supervisors took further adverse action

---

[6] The complaint against Cox concerned an incident in which he reprimanded a female African-American Corrections Officer, Cynthia Moore, for parking in a supervisor's space while ignoring similar behavior from other employees.  According to the complaint, Cox placed a no-parking sticker on Moore's car, but the sticker somehow found its way off of Moore's car and onto Cox's.  Cox confronted Moore about the placement of the sticker on his car and ordered her to write a report about the incident.  Later, however, Cox learned that Moore had not been the person who transferred the sticker from one car to the other, and he let the matter rest.  The state Affirmative Action Office found that Cox had engaged in gender discrimination because he "did not file an Incident Report regarding the sticker being removed from CO Moore's vehicle and it being placed on his, even though he was willing to pursue this issue when he thought that CO Moore was the culprit."  The Office recommended that Warden Farrell rectify the matter by "review[ing] with his supervisory staff . . . the proper handling of Incident Reports."  Doc. No. 78-24, at 4.

against her.  She identifies four incidents that occurred between November 2011 and December 2012.

### 1.     2011 5&2 Application

In November 2011, Daniels applied for a "5&2 position."  At BCC, a 5&2 officer does not necessarily perform a set of duties differing from that of other, *i.e.*, "5&3," employees, nor does a 5&2 officer receive more pay.[7]  The title instead refers to the employee's schedule—unlike 5&3 officers, 5&2 officers work a traditional five-day week with weekends and holidays off.  There are nineteen total 5&2 positions at BCC.  Doc. No. 70-10, at 13.

Because 5&2 positions attract a number of applicants, employees seeking such a posting are required to identify three 5&2 positions in which they are interested.  Daniels, however, identified only one: 5&2 Operations Officer.  Doc. No. 70-35, at 2.  The 5&2 Operations position requires such attributes as "flexibility" and the ability to "informal[ly] handl[e] . . . situations."  Doc. No. 70-11, at 31-32.  Daniels submitted her materials to Warden Farrell, who was responsible for recommending his choice to the district administrator.  Doc. No. 70-11, at 14.

Daniels was not selected for the posting.  Warden Farrell instead recommended Jackie Brown, a corrections officer who is both African-American and female.  At the time, Brown was more experienced than Daniels and had previously served in specialized postings that prepared her for her new position.  Doc. No. 70-12, at 13.

On January 6, 2012, Daniels filed a complaint with Connecticut's Commission on Human Rights and Opportunities ("CHRO").  She alleged that she had been denied the 5&2 position

---

[7] On the contrary, 5&2 officers have limited opportunities to work overtime and receive less generous retirement benefits than 5&3 officers.  Doc. No. 70-2 ¶ 24; Doc. No. 78-1 ¶ 24.

because of her race and gender and because she had previously filed reports about discrimination at BCC.

### 2.     2011-12 Performance Evaluation

On September 27, 2012, Daniels received her performance evaluation for the 2011-12 period.  Lieutenant Cox again rated her performance "Fully Successful" and again rated her only "Satisfactory" in the "Cooperation Interpersonal Skills" subcategory.  In connection with this rating, Cox wrote: "At times [Daniels] can be confrontational when she is in disagreement with others.  Also has the tendency to escalate rather than de-escalate.  Does a good job keeping supervisors informed when necessary."  Doc. No. 70-20, at 2.  Daniels responded to the evaluation by filing a complaint with Human Resources in which she stated, "I strongly believe that Lieutenant Cox has a problem with woman [*sic*] of color."  *Id.* at 8.

### 3.     2012 5&2 Application[8]

In November of 2012, Daniels again applied for a 5&2 position, and was again rejected.  Doc. No. 78-5, at 1.  The record does not reflect how many nor which of the nineteen 5&2 positions available at BCC she applied for this time.  As a result, there is some dispute about who was selected instead of Daniels.  Warden Farrell first testified that the position went to Jackie Brown when her posting was renewed in December of 2012.  Doc. No. 70-10, at 13.  However, he then admitted that he could not recall if there had been an open 5&2 position for which Daniels had applied that year that was awarded to another applicant.  *See id.* at 14.  On the other hand, Plaintiff testified that, while she was denied the 5&2 position in 2011 because Brown was more experienced, "when [Daniels] got seniority, [she] didn't get a 5 and 2 position, and

---

[8] Although discussed at some length in Plaintiff's brief opposing summary judgment [Doc. No. 78-2], there are no allegations concerning the denial of Daniels's 2012 5&2 application in the Amended Complaint, *see* Doc. No. 47, nor in her CHRO action, *see* Doc. No. 70-13.  Therefore, there are no claims or causes of action in this lawsuit for the Court to address in this ruling.  Because the underlying facts may serve as background evidence in support of Daniels's claim of discrimination regarding the denial of the correctional lieutenant position and her similar, but distinct, claim of retaliation, the Court includes this information and  addresses it accordingly.

someone with less seniority did, and they said, well, we're sorry, but, you know, he was more qualified, which was Officer Schneider."  Doc. No. 78-39, at 9-10.  Although Daniels's testimony is not completely clear on the point, it is reasonable to infer that she is referring to her 2012 5&2 application and indicating that Officer Schneider, who is a white male, received the posting instead of her, an inference supported by Deputy Warden Butricks's testimony that he could not recall "if it was Jimmy Snyder [*sic*] or Jackie Brown" who received the 5&2 position Daniels applied for in 2011, and that he was similarly unsure who received the position Daniels applied for in 2012.  Doc. No. 70-11, at 16-17.

### 4.      2012 Correctional Lieutenant Application

In December of 2012, Daniels applied for a promotion to correctional lieutenant. Correctional lieutenants supervise corrections officers.  A job description circulated in advance of Daniels's application indicated that a correctional lieutenant should have "considerable interpersonal skills," "considerable oral and written communication skills," and the "ability to accurately evaluate situations and make effective administrative and supervisory decisions." Doc. No. 78-29, at 1.

Candidates for the posting were scored using a matrix of six factors.  These factors were weighed to produce an overall rating of Superior, Acceptable, or Ineligible.  Doc. No. 70-16, at 4.  Warden Farrell, who was responsible for selecting candidates for promotion from the applicant pool, had to choose from the "Superior" candidates until none were left.  Only then could "Acceptable" applicants be selected.

Daniels scored an overall rating of "Acceptable" and was not selected to serve as a correctional lieutenant.  Her two "Fully Successful" evaluations produced a rating of "Acceptable" in the "Performance Evaluations" category.  Her "Candidate Summary" score,

which accounted for the quality of her application documents, was likewise "Acceptable," on the grounds that her materials contained "multiple errors in grammar, spelling or punctuation" and were insufficiently detailed.  *Id.* at 2.  Finally, in the "Facility Evaluation" category, Daniels scored "Not Recommended."[9]  Daniels's supervisors elaborated on this rating with comments indicating that she "ha[d] difficulty working with others to achieve what should be a common goal," "tend[ed] to avoid opportunities for informal resolutions," and "oftentimes create[d] an atmosphere of conflict and distrust."  *Id.* at 5.  Warden Farrell, Deputy Warden Butricks, Lieutenant Cox, and a captain named James Keel endorsed this assessment.  Daniels refused to sign the evaluation, instead inserting a comment attributing the result to her open CHRO complaint against Farrell.  *Id.* at 6.

In the cycle in which Daniels applied for a promotion, Warden Farrell selected four new correctional lieutenants.  Three were men (one white, one of Hispanic origin, one a Pacific Islander) and one, Tracey Flowers, was an African-American woman.  Doc. No. 78-43, at 1.

### 5.    Continuing Friction

Between September 2011 and December 2012, Daniels continued to file internal and external complaints on a variety of topics unrelated to unlawful discrimination.  In September 2011, she wrote up Warden Farrell and Deputy Warden Butricks for leaving BCC to get lunch.  Doc. No. 70-26, at 2.  In November, she wrote a letter to the State Ethics Commission in part because Farrell and Butricks had been hosting "private pizza parties" in a conference room.  Doc. No. 70-29, at 5.  In total, Daniels filed eight complaints during the period between July 27 and August 18, 2012.  Doc. No. 70-22, at 20–21.

---

[9] As for the other three categories, Daniels was rated "Acceptable" in the "Examination Score" category because she had passed the correctional lieutenant test, and she received "Superior" ratings in "Discipline" and "Time and Attendance."

Meanwhile, tension between Daniels and her supervisors increased in other areas.  In October 2011, she confronted Warden Farrell while he was leaving the prison grounds to get lunch.  They exchanged words and Daniels admits that she ended the encounter by directing a sarcastic remark at the Warden.  Doc. No. 70-6, at 100; Doc. No. 70-7, at 1.  The following August, she wrote Farrell a letter directing him not to contact union members about pending grievances, including the instruction, "[O]nce a grievance is written by the union for a bargaining member, your office can not contact them concerning the grievance," with the phrase "can not" printed in large, bold font.  Doc. No. 70-28, at 2.  In his reply, Farrell wrote that he found Daniels's "tone" "disconcerting" and admonished Daniels to cultivate "a more professional manner" when communicating with his office.  *Id.* at 3.

## II.    Discussion

Daniels alleges that her supervisors discriminated against her because of her race and gender and retaliated against her for raising complaints about discrimination at BCC.  She asserts that these impermissible motives drove her employer's decisions to deny her the 2011 5&2 position she applied for, to unduly scrutinize her log entries, to rate her only "Fully Successful" in two successive evaluations, and to decline to promote her to correctional lieutenant.  Daniels also alleges that some coworkers, most notably Warden Ford, subjected her to hostility in the workplace for the same unlawful reasons.

On these bases, she claims race- and gender-based discrimination, along with retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*  She further claims that her supervisors created a hostile work environment, also in violation of Title VII. Finally, Daniels argues that this same conduct violated the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-59 *et seq.*  DOC has moved for summary

judgment on each count of Daniels's nine-count complaint.  For the following reasons, summary judgment is GRANTED as to all counts of the complaint.

### A.    Standard

On a motion for summary judgment, the Court's role is limited to determining whether the record presents triable issues of fact.  Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material" fact is one that influences the case's outcome under substantive law, and a dispute is "genuine" if the evidence would permit a reasonable jury to find for the non-movant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The Court must view the record evidence in the light most favorable to the party opposing the motion, resolving factual disputes and drawing all reasonable inferences in the nonmovant's favor.  *Gallo v. Prudential Residential Servs. Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994).

### B.    Title VII Discrimination

Daniels argues that DOC discriminated against her based on her race and her gender by closely scrutinizing her log entries, by rating her "Fully Successful" on two evaluations, and by failing to award her the 5&2 and correctional lieutenant positions for which she applied.  Her Title VII discrimination claim is analyzed using the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  Under *McDonnell Douglas*, Daniels bears the initial burden to establish a prima facie case of discrimination.  If that showing is made, the burden shifts to DOC, who must offer a legitimate, non-discriminatory explanation for its actions.  The final burden belongs to Daniels, who must produce evidence sufficient to support the reasonable inference that DOC's explanation is mere pretext, a cover for

discrimination.  *Howley v. Town of Stratford*, 217 F.3d 141, 150 (2d Cir. 2000).  Daniels's

discrimination claim fails because she has not demonstrated that DOC's explanation for its

conduct is pretextual.

### 1.    Prima facie Case

To make out a prima facie case of employment discrimination, a plaintiff must show that:

(1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered

an adverse employment action; and (4) the action occurred under circumstances giving rise to an

inference of discrimination.  *Id*.  At this stage, the burden a plaintiff must carry to defeat

summary judgment is "*de minimis*."  *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d

Cir. 1994).

The parties agree that Daniels, an African-American woman, is a member of a protected

class.  But DOC disputes the last three elements of her prima facie case.

### a.    Daniels's Qualification for the Position

DOC apparently concedes that Daniels was qualified for the 5&2 operations officer

position, but disputes her qualifications to serve as a correctional lieutenant.  Under Title VII, a

plaintiff is qualified for her position if she possesses the basic skills needed for the job.  *Herbert

v. City of New York*, 748 F. Supp. 2d 225, 237 (S.D.N.Y. 2010).  At the time Daniels applied for

the correctional lieutenant post, she had worked at BCC for about fifteen years and had passed

the certifying examination for the position.  Doc. No. 78-35, at 1.  Daniels therefore qualified for

the position of Correctional Lieutenant.  *See Mingguo Cho v. City of New York*, No. 11 Civ.

1658, 2012 WL 4364492, at *5, 2012 U.S. Dist. LEXIS 137678, at *12-13 (S.D.N.Y. Sept. 25,

2012) ("[Plaintiff] was qualified for the position based on his examination score and ability to

speak English, as well as his employment history.").

### b.      Adverse Employment Actions

A plaintiff endures an adverse employment action when she experiences "a 'materially adverse change' in the terms and conditions of employment."  *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quoting *Richardson v. New York State Dep't of Corr. Servs.*, 180 F.3d 426, 446 (2d Cir. 1999)).  Though economic loss is not prerequisite to a finding of material adversity, "there must be a link between the discrimination and some 'tangible job benefits' such as 'compensation, terms, conditions or privileges of employment.'"  *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Karibian v. Columbia Univ.*, 14 F.3d 773, 778 (2d Cir. 1994)).  In this case, Daniels identifies four adverse employment actions: increased scrutiny of her log entries, denial of the 2011 5&2 position, two "Fully Successful" performance evaluations, and rejection of her application for correctional lieutenant.  The Court finds that the first two actions are not materially adverse, but the last two are.

*Increased scrutiny of log entries.*  Plaintiff argues that she suffered an adverse employment action when Lieutenant Lovisolo began to look closely at her log entries and criticize her for taking long breaks.  As a general matter, excessive scrutiny and criticism on the job are not adverse employment actions.  *Tepperwein v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011); *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 216-17 (E.D.N.Y. 2014).  Scrutiny and criticism can qualify as adverse actions only when they lead to "other negative results such as a decrease in pay or being placed on probation."  *Uddin v. City of New York*, 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006) (internal quotation marks and citation omitted).

Daniels argues that whether Lovisolo's actions and critical remarks bore on other employment decisions, such as her non-promotion to correctional lieutenant, "has not been

determined through discovery and creates an issue of material fact."  Doc. No. 78-2, at 34.  But issues of material fact are created by admissible evidence, not guesswork and speculation. Plaintiff has identified no record evidence suggesting that heightened scrutiny and unwarranted criticism led to further negative results; therefore, neither qualifies as an adverse employment action.

*Denial of the 2011 5&2 operations officer position*.  Daniels concedes that she was not denied a true promotion when her 2011 5&2 application was rejected.  Generally speaking, a plaintiff who has been denied a mere lateral transfer has not suffered an adverse employment action.  *Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 128 (2d Cir. 2004).  However, such a denial may constitute an adverse action when the desired position is "materially more advantageous than the employee's current position, whether because of prestige, modernity, training opportunity, or some other objective indicator of desirability."  *Beyer v. County of Nassau*, 524 F. 3d 160, 165 (2d Cir. 2008).  To prevail under such a theory, a plaintiff must demonstrate the objective benefits of the sought role; a plaintiff's unsupported opinion on the point will not defeat a motion for summary judgment.  *See Flynn v. New York State Div. of Parole*, 620 F. Supp. 2d 463, 485-86 (S.D.N.Y. 2009) ("[A] plaintiff cannot rely on her own opinion of the difference in prestige levels to withstand a motion for summary judgment.").

Here, Daniels argues that obtaining a 5&2 posting "provides candidates applying for promotions with an advantage."  Doc. No. 78-2, at 32.  However, she offers no "objective indicator of desirability" to support that contention.  Instead, she merely points to her own deposition testimony stating that holding a 5&2 post shows that "you know the facility as well as the different posting when it comes to a promotion."  *Id.*; Doc. No. 78-39, at 3.  This is simply a statement of opinion from Plaintiff, and does not provide a sufficient basis to defeat summary

judgment.  Daniels also suggests that the 5&2 position is a "preferred working schedule for officers," but an unfavorable schedule is not an adverse employment action.  *Albuja v. Nat'l Broad. Co. Universal, Inc.*, 851 F. Supp. 2d 599, 608 (S.D.N.Y. 2012).

Daniels attempts to bolster her subjective impression by suggesting that 5&2 officers commonly write disciplinary reports, which permits them to hone their report-writing abilities. This argument is not enough to demonstrate the job's objective desirability because nothing in the record shows any connection between 5&2 officers' enhanced opportunities to write reports and their chances for advancement in the BCC ranks.  Plaintiff does assert that "[s]upervisors, such as lieutenants, regularly engage in and sign off on disciplinary reports," but no evidence supports this contention.  The exhibit to which she cites is simply a report that Daniels herself wrote in her capacity as a corrections officer, and the Court's own diligent search has turned up nothing in the record that supports Plaintiff's assertion.[10]  *See* Doc. No. 78-2, at 32; Doc. No. 78-18, at 1.  In the absence of objective evidence showing that the 5&2 position offered opportunities for training and advancement beyond those afforded 5&3 corrections officers, the Court finds that the denial of the 5&2 operations officer position in 2011 was not an adverse employment action.

*"Fully Successful" performance evaluations.*  A poor performance evaluation is not by itself an adverse employment action, but if an evaluation has some "material impact, such as an effect on plaintiff's promotion opportunities or pay," it can qualify.  *See Bowen-Hooks*, 13 F. Supp. 3d at 217.  In this case, Daniels's performance evaluations represented one-sixth of the matrix that determined her eligibility for promotion to correctional lieutenant.  Doc. No. 70-16, at 2.  Thus, they are properly considered adverse employment actions.

---

[10] Moreover, the record shows that Daniels frequently wrote reports even though she never held a 5&2 post, suggesting a lack of meaningful difference between her actual position and the one she sought, with respect to report-writing opportunities.

Citing *Bowen-Hooks*, DOC argues that Daniels's performance evaluations do not qualify because they are not actually negative.  Daniels scored only one rank below the highest rating of "Excellent."  According to DOC, Daniels should not be able to recast a positive review as an adverse action simply because she feels it should have been even more positive.  *See Bowen-Hooks*, 13 F. Supp. 3d at 225 ("[T]he Court cannot characterize a positive evaluation as a negative one based solely on Plaintiff's belief that the evaluation should have been higher than it was.").

However, *Bowen-Hooks* is distinguishable.  In that case, the court characterized the plaintiff's evaluation as "positive" because "the record shows that this evaluation was not in fact lower than the evaluation for the previous year."[11]  *Id.*  Here, in contrast, Daniels received "Excellent" ratings in 2007-08, 2008-09, and 2009-10.  Her "Fully Successful" ratings in 2010-11 and 2011-12 were lower than she had received in previous years and therefore constitute adverse employment actions.

*Failure to promote to correctional lieutenant.*  DOC concedes that the failure to promote Daniels to Correctional Lieutenant was an adverse employment action.

### c.    Inference of Discrimination

DOC argues that Daniels has failed to show that she endured an adverse employment action in circumstances giving rise to an inference of discrimination.  Most of its argument, however, is directed toward showing that it had legitimate reasons for its actions.  Daniels has carried her "minimal" burden at this stage by producing evidence showing that employees outside of her protected class were promoted to correctional lieutenant instead of her.  Doc. No.

---

[11] The other cases on which Defendant relies also recognize this principle.  *See*, *e.g.*, *Spears v. Missouri Dep't of Corrs. & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000) ("In the present case, Spears avers that the Department lowered her 1992 performance rating from 'highly successful' to 'successful' following her complaint . . . , but she has presented no evidence that the Department subsequently used the evaluation to her detriment.").

78-43, at 1. *See Zimmerman v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001);

*Clarke v. 1 Emerson Drive N. Operations, LLC*, No. 13-cv-690, 2015 WL 3453388, at *3, 2015

U.S. Dist. LEXIS 69384, at *7 (D. Conn. May 28, 2015) (finding evidence that African-

American female plaintiff was replaced by non-African-American woman sufficient to meet

plaintiff's minimal burden at summary judgment phase with respect to prima facie case of race

discrimination).  Daniels also testified in her deposition that, at some point before 2011, she

overheard Lieutenant Cox tell a group of other employees that male officers are better than

female officers.  Doc. No. 78-39, at 39.  It is true that Daniels understood Cox to be joking and

that the comment lacks a close nexus with any adverse employment action.  *See Tomassi v.*

*Insignia Fin. Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) ("[T]he more remote and oblique the

remarks are in relation to the employer's adverse action, the less they prove that the action was

motivated by discrimination."), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*,

557 U.S. 167, 177-78 (2009).  However, this remark still supports an inference of discrimination

concerning the results of the 2012-13 promotional cycle, thus satisfying Daniels's burden and

completing her prima facie case.

### 2.    Legitimate, Nondiscriminatory Reasons

In the second step of the *McDonnell Douglas* inquiry, the burden shifts to the defendant

to articulate a legitimate, nondiscriminatory explanation for its decisions.  *Howley*, 217 F.3d at

150.  DOC has met that burden.  It attributes Daniels's poor evaluations to her tendency to be

confrontational and her inability to de-escalate controversies with her coworkers.  Doc. No. 70-

20, at 2.  It explains its decision not to promote Daniels with the assertions that she failed to

work well with other employees, "create[d] an atmosphere of conflict and distrust," and was

unwilling to resolve problems informally.  DOC asserts that the ability to achieve informal

resolutions was important at BCC and points to numerous occasions on which Lieutenant Cox declined to discipline Plaintiff formally even when he had cause to do so.  Doc. No. 70-2, at ¶ 111; Doc. No. 78-1, at ¶ 111.

These explanations are supported by a great deal of record evidence.  Daniels filed a large number of grievances in her capacity as union steward, many involving relatively minor matters, that occupied much of her supervisors' time.  For example, the record discloses no fewer than six instances in which Daniels filed formal complaints because supervisors had left BCC grounds to get lunch.  Daniels also admitted that she was sarcastic to the Warden on one occasion and the record reveals that she wrote him a sharp letter on another.  These are legitimate reasons for rating Daniels "Fully Successful" and declining to promote her to Correctional Lieutenant.

### 3.    Pretext

At *McDonnell Douglas*'s final step, the burden shifts once again to the plaintiff.  To defeat summary judgment, Daniels must "adduce admissible evidence that would be sufficient to permit a rational finder of fact to infer that the employer's proffered reason is pretext for an impermissible motivation."  *Howley*, 217 F.3d at 150.  "In order to survive a motion for summary judgment, at the third step a plaintiff must put forth adequate evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the employer were false, and that more likely than not the employee's protected status was the real reason for the [adverse action]."  *Pathan v. Connecticut*, 19 F. Supp. 3d 400, 414 (D. Conn. 2014) (quoting *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 129 (2d Cir.1996)).  Plaintiff advances a number of arguments that are said to demonstrate pretext: (1) BCC supervisors habitually favored white men over members of the protected class; (2) BCC's stated reasons for denying her correctional lieutenant application are unrelated to the position's demands; and (3) two prior incidents

demonstrate BCC's proclivity toward discriminatory intent.  These arguments fail to create a genuine issue of material fact.

### a.        Favoring White Men

Much of Daniels's argument is directed toward demonstrating that BCC supervisors habitually favored white men over members of the protected class.  *See Howley*, 217 F.3d at 150 ("Circumstances from which invidious discrimination may be inferred include preferential treatment given to employees outside the protected class.").  The record evidence, however, simply cannot support these arguments.  Quite to the contrary, the record evidence incontrovertibly indicates that, in at least some of the instances complained of, members of the same protected classes as Daniels were awarded the positions she sought.

Daniels argues, for instance, that "[o]f all the persons promoted to Lieutenant in Bridgeport in 2012-13 none were African American women; all were male."  Doc. No. 78-2, at 23.  This is not correct.  The record evidence establishes that one of the four corrections officers promoted to correctional lieutenant in that cycle was Tracey Flowers, an African-American female.  Doc. No. 78-43, at 1.  Plaintiff counters that Flowers did not serve at BCC prior to her promotion, and therefore was not similarly-situated.  Working as a corrections officer in New Haven, Flowers's performance evaluations were not conducted by Daniels's supervisors at BCC, nor were the BCC supervisors involved in providing a facility recommendation for Flowers.  However, the undisputed record evidence reflects that Warden Farrell sought out a "Superior" rated candidate for correctional lieutenant who was African-American and female in order to ensure diversity among the supervisors at BCC.  *See* Doc. No. 70-10, at 28-30.

Plaintiff also argues that BCC's decision to deny Daniels a 5&2 position in 2011, even if it was not itself an adverse employment action, reveals a pattern of disfavor directed toward African-

American women.  But as DOC points out, the 2011 5&2 position for which Daniels applied was filled by Jackie Brown, an African-American woman.[12]  These circumstances weigh against an inference of race or gender discrimination.  *See Bay v. Times Mirror Magazine, Inc.*, 936 F.2d 112, 118 (2d Cir. 1991) (rejecting the plaintiff's age discrimination claim in part because three employees retained after a restructuring were older than him); *Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP,* 869 F. Supp. 2d 378, 395 (S.D.N.Y. 2012) (holding that where the retained employees were within the same protected classes as the terminated plaintiff, no inference of discrimination can be drawn).  Similarly, although as Plaintiff points out, the promotion of three non-African-American men to correctional lieutenant in 2012 helps establish a prima facie case of discrimination, *see Clarke*, 2015 WL 3453388, at *3, 2015 U.S. Dist. LEXIS 69384, at *7, this alone is not enough to establish that Defendant's legitimate reasons are pretextual.  *See, e.g.*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993) (holding that once defendant has carried its burden of production, *McDonnell Douglas* framework and presumptions "simply drops out of the picture" and plaintiff must carry its burden of persuasion and show that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination).

Daniels's other purported examples of unlawful favoritism fail as well.  She claims that she was rejected for the 2012 5&2 posting and for correctional lieutenant in favor of Officer Schneider, a white male with less seniority than her, and that Lieutenant Lovisolo closely monitored her log entries even though he did not do the same to Officer Torres, a male.  But

---

[12] Daniels suggests that Brown's selection does not militate against an inference of discriminatory intent because Brown "was given preferential treatment and considered one of the guys."  Doc. No. 78-2, at 36.  Indeed, she argues, Brown was once not reprimanded for leaving the prison grounds even though other employees (some of them men) were.  *Id.*  That Brown was treated as "one of the guys" does not support Plaintiff's case, but undermines it: treating female employees the same as male employees and male employees the same as female employees is precisely what Title VII commands.  *See City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 711 (1978) (Title VII's "simple test" for unlawful discrimination is "whether the evidence shows 'treatment of a person in a manner which but for that person's sex would be different.'").

these occurrences are insufficient to cast doubt on Defendant's nondiscriminatory explanation that its actions were based on Daniels's frequent complaints and inflexible behavior, not her race or gender.

Daniels argues that Officer Schneider's selection as a 5&2 officer in 2012 provides evidence of prextext regarding Daniels' later denial for the position of correctional lieutenant, supporting the proposition that BCC habitually favors white males. [13]  Plaintiff testified that, when Jackie Brown was selected as a 5&2 officer in 2011, BCC justified its choice in part based on Brown's experience, which was more extensive than Daniels's.  Plaintiff argues that BCC's decision the very next year to hire an officer with less experience than Daniels[14] casts doubt on the credibility of its explanations.  In other words, this personnel decision undermines BCC's explanation for previously not selecting her for the position.  This argument fails.

While the Court must resolve ambiguities in the record evidence in Plaintiff's failure, *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001), it is undisputed that many characteristics other than seniority, such as flexibility and the capacity to handle issues informally were required of 5&2 officers.  *See, e.g.*, Doc. No. 70-11, at 31-32.  As a result, on this record, the BCC's preference for both Brown and Schneider over Daniels, regardless of experience on the job, does not mean that the preference for both of these candidates, or even Schneider alone, implied discriminatory intent, since seniority was but one of many requirements for the 5&2 position.

---

[13] While there are no Title VII claims concerning Daniels's 2012 5&2 application asserted in the Amended Complaint, this evidence is reviewed in order to determine whether DOC's legitimate, non-discriminatory reason for denying Daniels the correctional lieutenant position can be viewed as pretext.

[14] The Court again notes that the record is unclear whether Schneider or Brown received the 5&2 position that Daniels applied for in 2012, but the Court must resolve ambiguities and view the evidence in the light most favorable to the non-moving party.

Finally, Daniels's own assertions undermine her argument about Lovisolo: she states that his scrutiny "was retaliation for going to Deputy Warden Flodquist and Warden Ford about issues concerning him and other Lieutenants not doing their job."  Doc. No. 70-22, at 5.

Based on the record evidence, there is no genuine issue of fact that BCC supervisors habitually favored white men over members of the protected class, and therefore this argument does not allow Plaintiff to survive summary judgment based on pretext.

### b.    Invalid Reasons for Denying Promotion

Plaintiff also attacks BCC's reasons for denying her correctional lieutenant application by arguing that those reasons are unrelated to the position's demands.  Daniels asserts that DOC's purported concerns about her inflexibility and disinclination to address problems informally must be pretext because "the only qualification necessary for the correctional lieutenant position is to have worked as a corrections officer for four years."  Doc. No. 78-2, at 21.  This argument, too, fails because the record evidence once again reflects that its factual premise is untrue: the job description for the correctional lieutenant position lists a number of requirements under the heading "Minimum Qualifications Required," including "considerable interpersonal skills" and "ability to accurately evaluate situations and make effective administrative and supervisory decisions."  Doc. No. 78-29, at 1.

Daniels makes a similar argument with respect to the "Candidate Summary" category in her correctional lieutenant application review.  This category addressed the quality of an applicant's submitted materials, taking into account such factors as organization, grammar, and spelling.  Doc. No. 70-16, at 4.  In this category, Daniels was rated "Acceptable" because she "did not provide all information specified in the posting" and her documents had "multiple errors in grammar, spelling, or punctuation."  *Id.* at 2.  Daniels asserts "[t]he Correctional Lieutenant

position description . . . does not list a requirement for grammatical proficiency," which shows

that grammar is irrelevant to the position and BCC's reliance on the Candidate Summary score is

pretextual.[15]  Doc. No. 78-2, at 29.  But the correctional lieutenant description does list

"considerable oral and written communication skills," a category that comfortably embraces such

matters as grammar and spelling.  Doc. No. 78-29, at 1.  BCC's preference for grammatical

facility in its correctional lieutenants does not support an inference of discriminatory intent.

Based on the record evidence, there is no basis for inferring that the job qualifications for

correctional lieutenant required nothing more than having worked as a corrections officer for

four years; therefore, this argument does not allow Plaintiff to survive summary judgment based

on pretext.

### c.  Unrelated Prior Incidents Evidencing Discriminatory Intent

Finally, Daniels points to two events that did not involve her directly and occurred

outside the context of the adverse employment actions.  First, she reiterates that she once heard

Lieutenant Cox joke that men made better officers than women.  As discussed *supra* Section

II.B.1.c., the weak nexus between this occurrence and any decision related to Daniels's

employment greatly vitiates its force, and it thus does not provide much support for a reasonable

juror to conclude that the reasons given by BCC for its failure to promote Daniels were pretext.

Such a comment may "constitute evidence of discriminatory motivation when a plaintiff

demonstrates that a nexus exists between the allegedly discriminatory statements and a

defendant's [personnel] decision," but "[i]n the absence of a clearly demonstrated nexus to an

adverse employment action, stray workplace remarks are insufficient to defeat a summary

judgment motion."  *Vogel v. CA, Inc.*, 44 F. Supp. 3d 207, 223 (D. Conn. 2014).  Daniels could

---

[15] Defendant does not cite Daniels's subpar application materials in its memoranda, but the Candidate Summary
score was one-sixth of Daniels's overall rating.  To that extent, BCC relied on it as a reason to reject Plaintiff's
application.

not even specify the year, never mind the date, during which this joke was made.  *See* Doc. No. 78-39, at 39.  Courts have found factors such as when a remark was made in relation to the employment decision at issue and the context in which the remark was made, *i.e.*, whether it was related to the decision-making process, to be relevant in determining the remark's tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class.  *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir.2010).

Second, Daniels argues that, in 2011, an Affirmative Action Unit investigation found that Cox had discriminated against another corrections officer, Cynthia Moore, based on her sex.[16]  It is true that evidence of past discrimination, even discrimination against a party not before the court, bears on intent and can undermine an employer's nondiscriminatory explanation for its actions.  *See, e.g.*, *Dean v. Kraft Foods North America, Inc.*, No. 02-cv-8609, 2005 WL 1793532, at *6, 2005 U.S. Dist. LEXIS 15179, at *20-21 (E.D. Pa. Jul. 27, 2005).  However, this single incident, which was a far from analogous situation, is simply too remote and unconnected from the challenged employment decision to constitute evidence that DOC's explanation for the decision is pretextual.  *See Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1310 (7th Cir. 1997).

Significantly, neither of these two incidents touch upon racial discrimination at all and so fail to provide any support for an inference that the legitimate explanation provided by DOC is pretext for racial discrimination.  In terms of sex discrimination, these two examples of Lieutenant Cox's behavior, standing alone, do not provide "adequate evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the employer were false, and that more likely than not the employee's protected status was the real reason for the [adverse action]."  *Pathan*, 19 F. Supp. 3d at 414.  Although they may establish a prima facie

---

[16] The incident is discussed *supra*, note 6.

case of sex discrimination, they do not create a genuine issue of fact as to whether DOC's legitimate reason for terminating Plaintiff's employment is pretext. *See Lizardo v. Denny's, Inc.*, 270 F.3d 94, 103-04 (2d Cir. 2001) (in affirming summary judgment, determining that plaintiffs did not meet their burden to establish pretext because, among other things, plaintiffs' prima facie case, as well as the probative value of the proof that defendants' explanation was false, were weak); *Clark v. Jewish Childcare Ass'n, Inc.*, No. 12-cv-9372, __ F. Supp. 3d ___, 2015 WL 1452134, at *14, 2015 U.S. Dist. LEXIS 42552, *42-43 (S.D.N.Y. Mar. 31, 2015) (collecting cases).

In addition, because DOC's "stated reasons for the challenged action are strongly supported by the evidence, the burden on plaintiff to prove that they are a pretext for discrimination is substantial." *Lucibello v. Yale-New Haven Hosp.*, No. 03-cv-814, 2005 WL 578324, at *7, 2005 U.S. Dist. LEXIS 3604, at *22, (D.Conn. Mar.10, 2005); *see also Lieberman v. Gant*, 630 F.2d 60, 65 (2d Cir.1980) (holding that to allow a jury to discredit defendant's proffered explanation for its actions, plaintiff must show that the explanation is "so ridden with error that defendant could not honestly have relied upon it"); *Fuentes v. Perskie*, 32 F.3d 759, 765 (3rd Cir.1994) (to discredit employer's proffered reasons, plaintiff must demonstrate "weaknesses, implausibilities, inconsistencies, or contradictions in [them]"). These two incidents simply do not reach that threshold for casting doubt on DOC's stated reasons for not promoting Daniels to correctional lieutenant.

Moreover, the uncontradicted record evidence shows that one of the four corrections officers promoted to correctional lieutenant in that cycle was a woman. It severely undermines Plaintiff's argument that the reasons given for not promoting her were pretext for discrimination against women when a woman received the promotion Plaintiff was seeking. *Cf. de la Cruz v.*

*New York City Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 23 (2d Cir. 1996) (finding, in a case challenging transfer out of department, that the presence of other members of the same protected class as plaintiff in the department, "while not dispositive, confirms our conclusion that [employer's] asserted non-discriminatory reasons for [plaintiff's] transfer are not, as a matter of law, pretextual").

### d.      No Genuine Issue of Fact on Pretext

In sum, though Daniels has made the minimal showing required for a prima facie case with respect to her performance reviews and non-promotion to correctional lieutenant, she is unable to demonstrate that BCC's nondiscriminatory explanation for its conduct is pretextual. Therefore, Defendant's motion for summary judgment on Plaintiff's Title VII discrimination claims must be granted.

### C.      Title VII Hostile Work Environment

To demonstrate a hostile work environment in violation of Title VII, a plaintiff must identify evidence tending to show that the complained-of conduct: (1) is objectively severe or pervasive, *i.e.*, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because the plaintiff is a member of a protected class. *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007).  The plaintiff must demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  Whether conduct qualifies as sufficiently abusive must be assessed in all the circumstances and depends on such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.  As a general matter, "isolated incidents . . . will not suffice to establish a hostile work environment," though "a single episode of harassment can establish a hostile working environment if it is sufficiently severe." *Redd v. New York Div. of Parole*, 678 F.3d 166, 175-76 (2d Cir. 2012).

The standard for a hostile work environment claim is not an insubstantial one.  *See*, *e.g.*, *Spina v. Our Lady of Mercy Med. Ctr.*, No. 97-cv-4661, 2003 WL 22434143, 2003 U.S. Dist. LEXIS 19091 (S.D.N.Y. Oct. 23, 2003) (holding that alleged conduct by a supervisor over the course of fifteen months, including twice calling plaintiff a "bitch," commenting that she looked good in tight pants, taunting her by chanting her name, following her to the restroom, and yelling at her while pointing his finger in her face, was neither so pervasive nor so severe as to create a hostile working environment).

Here, Daniels's claim fails because she has not shown that the complained-of conduct was "objectively severe or pervasive." *Patane*, 508 F.3d at 113.  She identifies three occurrences that are said to demonstrate hostility in the workplace.  First, in February 2011, Lieutenant Lovisolo began to pay close attention to Daniels's log entries and directed her to write a report about why she had left her post for forty minutes.  Second, around the same time, Warden Ford made an announcement during roll call that addressed Daniels's concerns about employees leaving BCC property at lunch.  During the announcement, he criticized staff members who challenge their supervisors.  He did not mention Daniels's name, but Daniels says that she found the incident "embarrassing."  Doc. No. 78-2, at 42.  Third, after Ford made his announcement, some of Daniels's coworkers posted messages on Facebook.  Their posts did not name Daniels

but can plausibly be read to refer to Ford's statements at roll call.  The harshest of these posts read, "F--K THE STINKY HATERS."  Doc. No. 78-21, at 2.

These events do not make out a claim for hostile work environment.  Because Daniels identifies only three occurrences that happened within a week or so of one another, she has failed to show "pervasive" abusive conduct.  And these events, viewed objectively, are not "severe."  Lovisolo simply required Daniels to write a report, and neither Warden Ford nor the other employees so much as mentioned Plaintiff's name.  The Court cannot find that their behavior was objectively humiliating or intimidating, and thus, as a matter of law, the Court must find that it did not violate Title VII.  Accordingly, the motion for summary judgment on Daniels's hostile work environment claim must be granted.

**D.      Title VII Retaliation**

Daniels next argues that DOC unlawfully retaliated against her for filing numerous complaints alleging disparate treatment at BCC.  She asserts that BCC's retaliation took the form of excessive scrutiny of her log entries, denial of her 2011 5&2 application,[17] two "Fully Successful" performance evaluations, and rejection of her application for correctional lieutenant—the same actions identified in her discrimination claim.  Retaliation claims brought under Title VII are, like discrimination claims, evaluated under the *McDonnell Douglas* burden-shifting framework.  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).  Here, Plaintiff has not carried her burden to establish a factual issue about whether BCC's reasons for denying her 2011 5&2 application, rating her "Fully Successful," and rejecting her correctional lieutenant application are pretextual with respect to the alleged retaliation, and thus, the motion for summary judgment must be granted as to those claims.

---

[17] Again, as discussed earlier, there are no claims or causes of action in the present litigation predicated on the denial of Daniels's 2012 5&2 application for the Court to address in this Ruling and Order.

### 1.     Prima facie Case

To establish a prima facie case of Title VII retaliation, a plaintiff must show "(1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that she suffered an adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998).  DOC concedes that Daniels engaged in protected activity by filing a number of complaints concerning race and gender discrimination at BCC.  These included a complaint directed to Warden Ford in January 2011, a complaint against Lieutenant Lovisolo filed with the Affirmative Action Office in May 2011, an Affirmative Action complaint against Lieutenant Cox in October 2011, and a CHRO complaint filed, like this litigation, in January 2012.  DOC further concedes that it knew about Daniels's activity.  Finally, DOC does not dispute that the denial of the 2011 5&2 position, the "Fully Successful" performance evaluations, and the rejection of Daniels's application for promotion qualify as adverse employment actions under the standard of *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

With respect to these adverse actions, DOC instead argues that Daniels has failed to establish the fourth prong of a prima facie case, *i.e.*, a causal connection between her protected activity and the adverse employment actions.  The Court, however, finds that there is sufficient record evidence for a reasonable juror, drawing all inferences in favor of Plaintiff, to conclude that there was such a causal connection.  First, the temporal proximity of Plaintiff's complaints and Defendant's actions supports a causal inference.  Daniels's complaint against Lovisolo preceded her 2011 performance evaluation by four months, and her first interview in the Lovisolo matter by only three.  Her 5&2 application was rejected in December 2011, only a

month after she filed an Affirmative Action complaint against Cox.  While no bright line delineates the point at which the temporal relation between protected activity and adverse action becomes too attenuated to support an inference of causation, the Court finds that these time periods are sufficiently brief.  *See*, *e.g.*, *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (inferring causation because a retaliatory act followed the filing of an EEOC complaint by eight months).

As for the actions taken in the fall of 2012,[18] Daniels filed no new complaints in the preceding months.  But she was litigating both a CHRO complaint and this lawsuit at that time. Indeed, in August 2012, she filed with this Court a lengthy document [Doc. No. 70-22] describing in some considerable detail BCC's alleged misconduct.  *See Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002) (inferring causality based on the temporal relationship between plaintiff's activity in litigating his administrative case and an adverse employment action, even though plaintiff filed the administrative complaint a year before the adverse action occurred).  Even if the proximity of Daniels's activity in her open cases and the events in the fall of 2012 does not by itself establish a causal inference, it at least provides some support.

There also are the words and actions of Plaintiff's supervisors.  In February 2011, Daniels met with Warden Ford to tell him that she had drafted a report alleging unlawful discrimination at BCC and forwarded it to several state entities.  The two conversed about the report in Ford's office.  Ford asked whether Daniels would talk informally with Lovisolo instead of filing official complaints, and Daniels declined.  After a short time, Ford allegedly threw her out with the warning that she "would never be promoted" because she "talked too much."  Doc. No. 70-6, at 76.  Such words support an inference that Warden Ford disfavored Plaintiff because she had filed a complaint about discrimination.

---

[18] These were the second challenged performance evaluation and the non-promotion to correctional lieutenant.

To be sure, Warden Ford was not directly involved in any of the adverse actions at issue here.  But his criticism of Plaintiff's habit of filing complaints finds a parallel in the language employed by Cox, Butricks, and Farrell criticizing her performance.  Each thought poorly of her inflexibility, her "confrontational" nature, and her inability to address issues informally, and each stated that her evaluations and rejections for new posts were based in part on those characteristics.  From this evidence, a reasonable juror could infer that supervisors at BCC generally disapproved of the practice of filing complaints about unlawful discrimination, preferring that such matters be handled informally between the employees involved.  A reasonable juror might further infer that those same supervisors retaliated against Daniels because she refused to conform to those preferences.  Plaintiff has therefore made out her prima facie case for retaliation for DOC's denial of her request for the 2011 5&2 position, her "Fully Successful" performance evaluations, and the rejection of her application for promotion.

However, the Court finds that the additional scrutiny from Lieutenant Lovisolo fails to qualify as an adverse action for purposes of a retaliation claim, and thus Plaintiff has failed to make out a prima facie case with respect to this aspect of her claim.  *Burlington Northern* held that a plaintiff alleging retaliation under Title VII "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  548 U.S. at 68 (internal quotation marks omitted).  Even under this standard, excessive scrutiny and criticism, without more, are not adverse employment actions.  *See Workneh v. Pall Corp.*, 897 F. Supp. 2d 121, 135 (E.D.N.Y. 2012); *Evans-Gadsden v. Bernstein Litowitz Berger & Grossman, LLP*, 491 F. Supp. 2d 386, 400 (S.D.N.Y. 2007).  Therefore, summary judgment is granted on

Daniels's retaliation claim to the extent it concerns scrutiny of her log entries and criticism from
Lovisolo.

### 2.      Legitimate, Nondiscriminatory Reasons

Most of DOC's nondiscriminatory reasons for its actions are discussed *supra*, Section
II.B.2., in connection with Plaintiff's Title VII discrimination claim.  On the same basis, the
Court finds these reasons to be legitimate with respect to Daniels's retaliation claim.

In addition to the previously discussed nondiscriminatory reasons provided by Defendant,
it adds that, in the retaliation context, it rejected Daniels's 2011 5&2 application in part because
she had identified only one position that interested her even though she was instructed to choose
three.  This was not a relevant point in the earlier discussion because the 5&2 rejection was not,
in the context of a discrimination claim, an adverse employment action.  This additional reason
also appears to be legitimate based on the record.  *See*, *e.g.*, Doc. No. 70-12, at 13 ("Ms.
O'Brasky stated that I did not follow the memo and that she did not know if I would have been
considered for the position. . . .  I refused to list another 5x2 position in my quest for the
operational position because I am not interested in any other position.").

### 3.      Pretext

At the final stage of the *McDonnell Douglas* inquiry, "after the defendant has articulated
a non-retaliatory reason for the employment action, the presumption of retaliation arising from
the establishment of the prima facie case drops from the picture," and "[t]he plaintiff must then
come forward with [evidence that the] non-retaliatory reason is a mere pretext for retaliation."
*Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir.2013).  The plaintiff "need not
disprove a defendant's proffered rationale for its adverse actions[,]" but rather, "there are two
distinct ways for a plaintiff to prevail" in "establish[ing] that an adverse employment action was

motivated by discriminatory retaliation"—"either by proving that a discriminatory motive, more likely than not, motivated the defendants or by proving both that the reasons given by the defendants are not true and that discrimination is the real reason for the actions." *Summa v. Hofstra Univ.*, 708 F.3d 115, 129 (2d Cir. 2013) (internal quotation marks and citations omitted). "[T]emporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir.2010). "However, a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Zann Kwan*, 737 F.3d at 847. Pretext may be established by such "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons" that would raise doubt in the factfinder's mind whether the employer did act for those reasons. *Id.* at 846.

With respect to the 5&2 position, the discussion *supra*, Section II.B.3.a., demonstrates that DOC's multiple reasons for preferring other candidates for the 5&2 positions do not amount to "inconsistent employer explanations," and thus the temporal proximity discussed *supra* Section II.D.1. with respect to Daniels's prima facie case is not enough on its own to preserve the question of pretext for a jury. Therefore, the Court must dismiss Plaintiff's retaliation claim for the denial of the 2011 5&2 position.

With respect to the "Fully Successful" performance evaluations, Plaintiff has not pointed to any evidence suggesting that the nondiscriminatory reasons proffered by Defendant are

pretextual.  Therefore, summary judgment is granted on the claim of retaliation for these evaluations.

With respect to the correctional lieutenant promotion, Defendant had argued that she did not receive it in part because "she did not have a good relationship with the Warden's office even before she engaged in protected activity."  Doc. No. 70-1, at 23.  Plaintiff points to evidence that, despite her differences with Warden Ford, they had an excellent and professional working relationship.  Doc. No. 70-39, at 55.  However, Warden Ford was not involved in any of the adverse actions taken against Plaintiff, all of which occurred after he left BCC, and the undisputed record evidence indicates that she and Warden Farrell, whom she would have to work with closely if she received the sought-after promotion, "never had a good working relation" and "it was not a good working environment or conditions under Warden Farrell."  *Id.* at 55-56.  Rather than raising doubt regarding DOC's proffered nondiscriminatory basis for selecting others for the promotion ahead of Daniels, based on the absence of the good working relationship necessary to be effective in the position, the record reinforces it.  Therefore, summary judgment is granted on the claim of retaliation for the correctional lieutenant promotion decision.

### E.      State Statutory Claims

Daniels has brought five claims under CFEPA, contained in the second, fourth, seventh, eighth, and ninth counts of the Amended Complaint: race and gender discrimination and retaliation in violation of § 46-60(a), discrimination by a state agency in violation of § 46a-70(a), and deprivation of constitutional and statutory rights in violation of § 46a-58(a).  Each of these claims is barred by the Eleventh Amendment, and summary judgment must be granted.

The Eleventh Amendment denies the federal courts jurisdiction to hear suits by private parties against states and their instrumentalities.  *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44,

54 (1996).  A state is free to waive its Eleventh Amendment immunity and consent to suit in federal court.  It is also free to consent to suit in the courts of its own creation without consenting to suit in a federal forum.  *Smith v. Reeves*, 178 U.S. 436, 441 (1990).

Under the statutes at issue in this case, Connecticut has waived its immunity with respect to suits in state court, but not with respect to suits in federal court.[19]  *See Wagner v. Conn. Dep't of Corr.*, 599 F. Supp. 2d 229, 237 (D. Conn. 2009) ("Under CFEPA, the State has waived its immunity only as to cases brought in the Connecticut Superior Court."); *Lyon v. Jones*, 168 F. Supp. 2d 1, 6 (D. Conn. 2001) (relying on the Eleventh Amendment to dismiss claims under §§ 46a-60(a), 46a-70(a), and 46a-58(a)); Conn. Gen. Stat. § 46a-99 (providing that a person aggrieved under CFEPA may "petition the superior court for appropriate relief").  Defendant's motion for summary judgment on Plaintiff's state-law claims must therefore be granted.[20]

## III.    Conclusion

Accordingly, Defendant's motion for summary judgment [Doc. No. 70] is hereby GRANTED in full.  The Clerk is directed to enter judgment in favor of Defendant and to close this case.

So ordered at Bridgeport, Connecticut, this 17th day of August, 2015.


   /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge

---

[19] Regarding Plaintiff's claim under § 46a-58, summary judgment is appropriate on the alternative ground that the statute does not authorize a private right of action.  *Lyon*, 168 F. Supp. 2d at 5 n.1.

[20] Because Eleventh Amendment immunity is in the nature of a jurisdictional bar, the judgment is without prejudice to refiling in a court of competent jurisdiction.  *See Freeman v. Oakland Unified Sch. Dist.*, 179 F.3d 846, 847 (9th Cir. 1999).